UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JOSHUA  PEARMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:14-cv-00120-SEB-TAB |
| | ) | |
| NEW ALBANY CITY GOVERNMENT, | ) | |
| SHERRI  KNIGHT, | ) | |
| KEITH  WHITLOW, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendants' Motion for Summary Judgment [Docket No. 29], filed on December 4, 2015.  Plaintiff Joshua Pearman ("Officer Pearman") brings this suit against his employer, Defendant New Albany City Government ("the City"), and Defendants Sharon Knight[1] and Keith Whitlow (collectively, "Defendants"), alleging that he was discriminated against based on his disability and that Defendants failed to provide him with a reasonable accommodation, in violation of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*  Officer Pearman has also alleged a promissory estoppel claim against the

---

[1] Although Ms. Knight commonly goes by the name "Sherri," her legal name is "Sharon." Knight Aff. ¶ 1.

City.[2]  For the reasons detailed below, we <u>GRANT</u> Defendants' Motion for Summary Judgment.

## **Factual Background**

Officer Pearman began working for the City in May of 2000 as a First Class Patrolman with the New Albany Police Department ("NAPD"), in which capacity he has worked continuously up to the present.  At all times relevant to this litigation, Defendant Keith Whitlow was employed by the City as a Major with the NAPD and Defendant Sharon Knight served as the Chief of Police with the NAPD.

## **Job Description for Patrol Officer**

The City's job description for the Patrol Officer position includes the following duties:

> Enforces local, state, and federal laws by implementing effective policy for the prevention and investigation of crimes to protect the lives and property of the people.

> Regularly patrol the city streets, and other designated areas, ensuring the security of residences and businesses, investigate and report all suspicious or unlawful activities, and perform necessary actions to ensure the proper enforcement of applicable laws.

---

[2] In his Complaint, Mr. Pearman also alleged a retaliation claim under the ADA as well as a state law claim for intentional infliction of emotional distress.  However, by failing to respond to Defendants' arguments on summary judgment, Mr. Pearman has abandoned these claims. Accordingly, we <u>GRANT</u> Defendants' Motion for Summary Judgment on Plaintiff's ADA retaliation and intentional infliction of emotional distress claims.

Monitor radio and other communication devices and respond to citizen's calls of distress, domestic disputes, and complaints of unlawful activity, assess and bring situations under control, take statements from victims and witnesses, provide appropriate assistance, and ensure the lawful apprehension and arrest of criminal offenders, as required by law.

Stop drivers of vehicles for traffic violations, verify license and registration data, advise drivers of safe driving practices and issue warnings, citations, and effect arrests as warranted.

Pursue, apprehend, search and arrest suspects using only necessary force, advise suspect of rights and transport suspects to detention areas.  Prevent individuals from injuring others by using physical restraint or appropriate weapons.

Respond to reports of traffic accidents, assess extent of personal injuries, call for medical assistance and take statements from victims and witnesses. Assist with extracting victims, providing emergency medical care, lifting individuals onto stretchers and into medical vehicles.  Direct the removal of vehicles involved, and ensure area is clear.

Participate in the formal investigation of crime by searching crime scenes and following prescribed procedures to preserve and protect evidence, interview victims and witnesses, conduct neighborhood checks and completing all necessary case reports, as required or assigned.

Respond to residential and business alarms, investigate potential unlawful activity, initiate appropriate action to properly enforce applicable laws and/or protect the lives and property of the public.

Maintain the cleanliness and good appearance of police vehicle, uniforms, required equipment and supplies.

Provide a variety of public services such as funeral escorts and assisting stranded motorists.

Direct vehicular and pedestrian traffic when congestion occurs or as directed.

Prepare and submit to superiors all required reports and summaries of activities according to established departmental guidelines.

Attend daily shift meetings to receive and share pertinent information regarding incidents and activities occurring within the city.

Testify in court in criminal or civil cases, as required by order of the court following established departmental policies and procedures.

Occasionally attend prescribed in-service training and/or training programs for certification/recertification in specialized law enforcement areas, as assigned or required.

Perform related duties as assigned.

Dkt. 31-3 at 1-2.

The NAPD's Patrol Officer job description further provides, *inter alia*:

Ability to deal swiftly, rationally, and decisively with potentially violent individuals in precarious situations, and to effect forceful arrest as situations demand.

Ability to physically perform the essential duties of the position, including but not limited to, pursuing suspects by driving vehicle at a high rate of speed, running, climbing stairs, forcing entry, scaling walls, and jumping fences.

Knowledge of and ability to … legally operate department vehicles.

4

*Id.* at 2-3.

With regard to the physical effort required to perform the duties of a patrol officer, the job description provides: "No prolonged, extreme physical demands are associated with normal duties or assignments, but incumbent performs regular automobile patrols and must exert strenuous physical effort during emergency situations, such as chasing and apprehending offenders, assisting with emergency evacuations, and care of vehicular accident victims. *Id.* at 3-4.

**Plaintiff's First Surgery**

After experiencing varying degrees of pain in his right ankle for a number of years, Officer Pearman began having more serious difficulty walking and sought treatment on July 25, 2012. Dkt. 31-10 (Pl.'s Timeline). Upon examination, Officer Pearman's physician determined that surgery was necessary and restricted Pearman from performing all his work duties.[3] On August 31, 2012, Officer Pearman underwent arthroscopic surgery on his right ankle and took sick leave during this period of time. Pearman Dep. at 48-49. Following surgery, Officer Pearman was restricted from work until September 28, 2012, at which point his physician released him to return to work under light duty status if he wore an ankle brace and limited his walking and standing. *Id.* at 50.

---

[3] Mr. Pearman suffers from osteoarthritis, bursitis, hammer toe, equinus deformity of the foot, edema, tenosynovitis, and pain in his right ankle.

**Light Duty Policy**

In 2012, the NAPD had in place various standard operating procedures ("SOPs"),
including one addressing the Department's light duty policy, which provided: "An officer
on authorized sick leave may be used for limited duty if approved by the physician and
has/her commanding officer."  Dkt. 31-12 (SOP Excerpt Regarding Light Duty).  It is
undisputed that this policy does not mandate that a light duty position be provided to
every officer on authorized sick leave.  Rather, a standing policy was implemented on
July 26, 2005 that was distributed to all NAPD officers, which provided:

> Because of the new phone system, the amount of limited duty will be just
> that, limited.  We will not work limited duty on night shift because there is
> no need for an officer working the front desk.  However, there may be some
> exceptions, for example; an officer is feeling sick and does not want to go
> home, or an officer has experience a slight injury, in such a case as this a
> commander may grant light duty, but not for an extended period of time.

> An extended period of time will be considered Three (3) working days or
> more, and must be accompanied with an excuse from a doctor.

> We will utilize extended limited duty only when it is advantageous to the
> department.  The primary time for extended limited duty will be between
> the hours of 8:00 AM and 4:00 PM.  This is that time we need an officer
> answering the phone, and addressing the people that come to the front desk
> needing assistance.  In some cases we will work extended limited duty
> between the hours of 4:00 PM and 12:00 midnight, but only as needed.

> When an officer wants to work extended limited duty, the officer must get
> permission from the Major, or if the Major is not available the officer will
> contact the next person in the chain of command.

6

Limited duty is covered in the S.O.P. chapter 10; section 5.

Dkt. 31-13.

Officer Pearman described the way in which the light duty policy of the NAPD in 2012 worked in practice, as follows:

> For the entire time that I'd been there, the policy was pretty much a gray area. It was one sentence in the SOP manual that basically read if your doctor and your commanding officer agree you can work light duty, then you can work light duty. In that entire time that I had been there since 2000, light duty had almost always meant working the information desk – answering the phones, taking reports from people that walk in the lobby. You're not wearing a uniform; you cannot drive a marked police vehicle. You are just doing more of a clerical type of work, but you're still able to make standard police reports for people and things of that nature.

Pearman Dep. at 61-62.

**Plaintiff Requests Light Duty Assignment**

Officer Pearman was approved for light duty by his physician on September 28, 2012, after which he telephoned his immediate supervisor, Corporal Mark Richards, to advise Richards of his light duty eligibility status. Cpl. Richards in turn spoke with Major Whitlow, who was charged with approving light duty for Officer Pearman. After speaking with Major Whitlow, Cpl. Richards informed Officer Pearman that Major Whitlow had stated there was no light duty position available. Pearman Dep. at 52-53, 66. After receiving that information, Officer Pearman did not return to work and instead continued to use his sick leave. According to Officer Pearman, he emailed back and forth

with both Major Whitlow and Chief Knight throughout the next several months, continually updating them of his status. *Id.* at 53-54.

On November 7, 2012, Officer Pearman's physician advised him that his right ankle was not healing correctly and ordered an MRI, which revealed several torn ligaments and soft tissue damage. Following the MRI, Officer Pearman was referred to a more advanced orthopedic surgeon. Pearman Dep. at 54-56; Dkt. 31-10 ¶ 4. At that point, Officer Pearman was able to walk only short distances before requiring rest and, while he could drive if necessary, his physician did not want him to drive and opined that it was unsafe for him to do so in his condition. Pearman Dep. at 58. Officer Pearman testified that he was still cleared for light duty work by his physician at this time. However, he continued to take sick days because he had been told there was no light duty work available at the NAPD. *Id.*

**Plaintiff Requests and Receives Extensions of Sick Leave**

By November 27, 2012, Officer Pearman had exhausted all of his sick, personal, and vacation days.[4] Officer Pearman then requested an extension of sick leave of an additional thirty (30) working days from the Police Pension Board, which was approved. The Pension Board subsequently approved Officer Pearman's second request for an extension, this time for an additional sixty (60) working days of sick leave. Officer

---

[4] During the relevant time period, Officer Pearman received twenty-eight (28) vacation days per year as well as 80-90 days of sick leave every two years. Pearman Dep. at 37-40.

Pearman received his full pay and benefits during these leave extensions.  Pearman Dep. at 71.

Chief Knight sat on the Pension Board during the time period when the Board approved Officer Pearman's requests for additional sick leave and she voted in favor of granting both of his extension requests.  Pearman Dep. at 118-119; Knight Aff. ¶ 19. During this same time period, Major Whitlow served on the pension board as pro temp for Mayor Gahan.  While he did not vote on any matters before the Board, including those involving Officer Pearman, he did not speak out against or otherwise attempt to hinder Pearman's sick leave extensions.  Knight Aff. ¶ 20; Pearman Dep. at 118-119.

**Plaintiff Performs Certain Light Duty Assignments**

On December 26, 2012, Officer Pearman's orthopedic surgeon diagnosed him with a severe degenerative bone issue in his right ankle joint.  However, Officer Pearman was still cleared to perform light duty up until March 1, 2013, when his second surgery was scheduled.  Pearman Dep. at 72-73; Dkt. 31-10 ¶ 6.

Major Whitlow contacted Officer Pearman on January 2, 2013, and offered him a special detail that included performing various tasks around the NAPD, including cleaning the evidence vault and other areas of the Department as well as construction of a police key holder.  Pearman Dep. at 74-75; Dkt. 31-10 ¶ 7.  Officer Pearman performed these assignments for twenty-two (22) working days and during this period, Officer Pearman was not required to use sick leave and he received full pay and benefits.  *Id.* Officer Pearman was then advised that the NAPD had "run out of things for [him] to

complete" and light duty was no longer available, so he returned to drawing down on the extra days of sick leave he had been granted by the Pension Board, during which time he continued to receive his full pay and benefits leading up to his March 1, 2013 surgery. Pearman Dep. at 74-76; Knight Aff. ¶ 11.

**Plaintiff Receives Temporary Disability**

Following the March 1 surgery, Officer Pearman's orthopedic surgeon prohibited him from performing all work duty until June 20, 2013. Plaintiff Dep. at 76. On June 20, 2013, Officer Pearman was cleared to perform "light duty" work with the restrictions of "no running/jumping for 3 months." Dkt. 31-14 (Return to Work Note). Officer Pearman contacted Major Whitlow to notify Whitlow that he was cleared for light duty, but was informed that there were no light duty assignments available. Accordingly, Officer Pearman again used his accrued sick leave. Pearman Dep. at 77.

By July 9, 2013, Officer Pearman had exhausted his vacation, personal, and sick days as well as all of the extended sick leave allowed under the Pension Board's bylaws. At that point, he applied for and the Pension Board granted him temporary disability for 180 days, pursuant to Indiana Code § 6-8-6-8. Pearman Dep. at 78-82; Dkt. 31-10 ¶ 10. Chief Knight sat on the Pension Board at the time the Board approved Officer Pearman's receipt of temporary disability pay and voted in favor of Pearman's request. Pearman Dep. at 118-119; Knight Aff. ¶ 21. Major Whitlow was not involved in that decision. Knight Aff. ¶ 22. While on temporary disability, Officer Pearman received fifty percent of his salary and the continuation of his full benefits. Knight Aff. ¶ 21.

**Plaintiff Returns to Full Duty**

On December 16, 2013, Officer Pearman was cleared by his orthopedic surgeon to return to full-time duty.  Pearman Dep. at 82; Dkt. 31-10 ¶ 11.  After Officer Pearman successfully passed an examination administered by a physician at the Indiana Public Safety Board, Chief Knight immediately facilitated his return to full duty and reinstated his full pay.  Pearman Dep. at 82-85; Knight Aff. ¶ 23.  Officer Pearman continues to serve as a patrol officer for the NAPD.

**Other NAPD Officers Who Received Light Duty Assignments**

Merle Harl, who was the shift captain who supervised Officer Pearman during the relevant time period, testified by affidavit that he did not know the circumstances surrounding the denial of Officer Pearman's requests for light duty, but that in his experience, he could not recall anyone other than Pearman who was denied a light duty assignment.  Harl Aff. at 10.  Captain Harl further testified that light duty assignments at the NAPD when he was Chief of Police included working at the front desk, various types of paperwork, and painting walls and other things around the building.  *Id.*  According to Captain Harl, other NAPD officers worked light duty assignments at the time that Officer Pearman's request to work light duty was denied, and thus, in Harl's opinion, it was a "little bit unfair" to have "two or three working [light duty], and one not" and that "something should have been found for [Pearman] to do."  *Id.* at 13-14, 16-17.  Captain Harl also testified that it was beneficial to have officers on light duty handle reports at the information desk to free up other officers to patrol.  *Id.* at 17-18.

11

John Hall, an NAPD officer who served as a sergeant and president of the Fraternal Order of the Police during the relevant time period, testified that he observed NAPD officers working light duty assignments during the time period that Officer Pearman was denied light duty work.  Hall Dep. at 10-11.  He further testified that while he knew of a few other officers, including himself, who had been denied light duty work under different administrations, he believed that light work was routinely given to anyone who applied for light duty.  *Id.* at 12-13.  According to Officer Hall, it was unfair that Officer Pearman was not given light duty work when other officers were working light duty and there was light duty work available at the front information desk.  *Id.* at 13-14.

Mark Richards served as a corporal on Officer Pearman's shift during the relevant time period and was Plaintiff's lowest ranking supervisor.  Richards Dep. at 8.  He testified that at the time Officer Pearman first requested and was denied light duty there were no other officers performing light duty, but that he believed that other NAPD officers were subsequently allowed to work light duty while Officer Pearman was still being denied.  *Id.* at 12, 17-18.  Cpl. Richards further testified that he believed there was usually a position available for light duty on the three shifts, but that it was left to the discretion of the chief of police as to whether the chief wanted to offer light duty or not.  *Id.* at 9-10, 17.  It was Cpl. Richards's view that it benefitted the shift to have officers on light duty who could assist in answering telephones and preparing reports.  *Id.* at 15-17.

According to Officer Pearman, he was contacted on June 20, 2013, during the period of time when he was off work as a result of his ankle injury, by Captain Mike

12

Lawrence who told him that NAPD officers Ken Fudge and Julie Condra had been allowed to perform light duty work while recovering from injuries by working the front desk. Pearman Dep. at 90-95. Officer Pearman also alleges that he observed Condra working the front information desk as a light duty assignment while recovering from a leg injury on January 22, 2014. Pl.'s Compl. ¶ 41. Neither Condra nor Fudge are patrol officers; rather, Condra was a sergeant and Traffic Enforcement Officer/Communications Supervisor at the time and Fudge served as a captain as Chief of Detectives. Pearman Dep. at 91-92; Knight Aff. ¶¶ 15-16. A large part of both of their jobs involved desk work. Pearman Dep. at 92-93; Knight Aff. ¶¶ 15-16.

Officer Pearman alleges that after he returned to work full time, on January 6, 2014, he observed Daniel Dickey working at the NAPD front desk while recovering from a leg injury. However, he concedes that he does not know whether Dickey was being paid for working the front desk or whether, as Chief Knight contends, Dickey was volunteering to work the front desk on his own time while using his sick leave for the time he was missing from his regular duty job. Pearman Dep. at 103-104; Knight Aff. ¶ 17. On March 25, 2014, Officer Pearman observed Sal Zagami performing light duty work while recovering from an injury, but does not allege that he observed Zagami working at the front desk. Pearman Dep. at 94.

**Plaintiff's Grievance**

On January 12, 2014, after observing Daniel Dickey performing light duty, Officer Pearman filed a grievance with the New Albany Board of Public Works and Safety

13

("B.O.W.")[5] asserting that Dickey, who had an injury similar to his, was allowed to work limited duty at the front information desk, when Pearman had previously been denied the same opportunity.  Pearman Dep. at 102-103.  On February 11, 2014, the B.O.W. conducted a hearing on Officer Pearman's grievance and determined that the grievance was untimely and that, even if it had been timely filed, "the occurrence upon which [the grievance] is based, does not give rise to a grievance; as the individual who the grievant claimed was working limited duty, was in fact volunteering his time; and the Chief of Police has the sole discretion with respect to decisions on limited duty assignments." Exh. D-C attached to Knight Aff.; Defs.' Exh. J.

At this grievance hearing, Chief Knight presented a document that she described as the relevant SOP related to light duty work.  However, it is undisputed that the document she presented was in fact not the governing SOP; rather, according to Chief Knight, it was an older version of the SOP that she had retrieved from the NAPD computer system after performing a word-search using the term "limited duty" to search the system's directory.  Knight Aff. ¶ 26; Exhs. D-D and D-E attached thereto.  The document presented by Chief Knight differed from the version of the SOPs Officer Pearman and the other NAPD officers had in their possession at the time.  However, it is undisputed that, despite the differences between the documents, both versions of the SOP provided that whether to allow light duty assignments was discretionary.  Chief Knight

---

[5] The B.O.W. is a quasi-judicial board responsible for handling work-related grievances brought by NAPD officers.  Knight Aff. ¶ 24.

contends that her submission of the wrong version of the SOP at Officer Pearman's grievance hearing was inadvertent.

**The Instant Lawsuit**

On October 20, 2014, Officer Pearman filed his Complaint in this action, alleging, *inter alia*, a disability discrimination claim under the ADA and a claim for promissory estoppel. Defendants filed their motion for summary judgment on December 4, 2015. That motion is now fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat

15

a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate.  *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but it is mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element necessarily renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.

## II.    Discussion

### A.    ADA Claims

16

The ADA provides among other protections safeguards for disabled individuals against workplace discrimination.  In the employment context, the ADA provides that no employer subject to the Act shall "discriminate against a *qualified individual on the basis of disability* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis added). The statute further defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* at § 12111(8).

To establish a *prima facie* claim under the ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he has suffered from an adverse employment decision because of his disability.  *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (citing *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002)).  An employee may state a claim for discrimination under this portion of the ADA in one of two ways.  *See Basith v. Cook County,* 241 F.3d 919, 926–927 (7th Cir. 2001).  First, he can claim that he suffered disparate treatment—in other words, that the employer treated him differently *because of* his disability.  *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–1022 (7th Cir. 1997).  Second, an employee may claim that her employer violated the ADA by failing to provide a reasonable accommodation for his known disability.  *Id.* at 1022.  This "failure

to accommodate" cause of action derives from the statute's provision that the definition of discrimination includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]."  42 U.S.C. § 12112(b)(5)(A); *see also Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1283 (7th Cir. 1996).

Here, Plaintiff's attorneys failed to explicitly address the elements of either of his claims, relying instead on substantial excerpts from deposition testimony which they believe establishes facts in dispute sufficient to preclude summary judgment.  We are left to surmise that Plaintiff is alleging that Defendants failed to provide a reasonable accommodation for his known disability and that he was treated differently because of his disability.  We address both of these theories in turn below.

### 1.    Failure to Accommodate

We interpret Officer Pearman's failure to accommodate claim to be that Defendants violated the ADA by failing to reassign him light duty assignments for the entirety of the time he was cleared to perform light duty work by his physician, and was unable to perform full duty work.  In order to prevail on a "failure to accommodate" ADA claim, a plaintiff must set forth evidence establishing that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the

employer failed to reasonably accommodate the disability. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citation omitted).

Even assuming that Officer Pearman is able to satisfy the first two prongs of this test, he has failed to show that Defendants failed to reasonably accommodate his disability. This claim thus cannot survive summary judgment. Permitting the use of accrued paid leave or unpaid leave can be a form of reasonable accommodation under the ADA when necessitated by an employee's disability. E.E.O.C. Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *14 (Oct. 17, 2002) (citing 29 C.F.R. pt. 1630 app. § 1630.2(o) (1997)); *see Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 755, 782 (6th Cir. 1998)). Under the ADA, an employer is not required to provide paid leave beyond that which is provided to similarly-situated employees. *Id.* The implementing regulations provide that employers should allow an employee with a disability to exhaust accrued paid leave first and then provide unpaid leave. *Id.*

Here, Defendants allowed Officer Pearman to use all of his accrued paid leave after which, rather than providing him unpaid leave, he was granted an additional ninety (90) days of sick leave so he could continue to utilize paid leave. When he had exhausted his extra sick leave, he was granted temporary disability allowing him to retain his full benefits and fifty percent of his pay, retain his seniority and avoid having to go on unpaid leave. Moreover, Defendants granted Officer Pearman's request for light duty during a twenty-two day period when that kind of work was available. As Defendants point out,

19

despite being unable to perform his job duties for approximately eighteen months, they held his job open for him so he could return to the same rank, position, shift, and duties he held as soon as he was cleared for full duty.

Officer Pearman argues that, by failing to provide him light duty work throughout the entirety of the eighteen months, he was unable to perform the essential functions of the patrol officer position. Thus, Defendants violated the ADA. While it is true that reassignment to a vacant position that the disabled employee can perform can constitute a reasonable accommodation under the ADA, "[a]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation. *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 951 (7th Cir. 2001) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)).

Although Officer Pearman has cited general, anecdotal evidence to show that at some points during the eighteen month period when he was unable to perform the essential duties of the patrol officer position, certain other employees were given light duty assignments. However, he has failed to establish that vacant light duty assignments existed over the entire time he was disabled. Even if he could do so, he would not necessarily be entitled to his preferred accommodation (i.e., continuous light duty assignments). The fact that Defendants provided him instead with a combination of accommodations, including paid leave, granting him additional paid leave, short term disability as well as some light duty work, does not establish that Defendants failed to

reasonably accommodate him.  Plaintiff has put forth no argument otherwise.

Accordingly, Defendants are entitled to summary judgment on this claim.

### 2.    Disparate Treatment

We turn next to Plaintiff's disparate treatment claim.  To establish a claim of

discrimination based on disparate treatment because of disability, plaintiff must show: (1)

he is disabled; (2) he is otherwise qualified to perform the essential functions of his job;

and (3) he has suffered from an adverse employment action because of his disability."

*Dvorak*, 289 F.3d at 483.  A disparate treatment claim under the ADA is similar to

actions for discrimination under Title VII of the Civil Rights Act, in that a plaintiff may

present proof of discrimination either directly or indirectly; the "indirect" method

corresponds to the burden-shifting *McDonnell Douglas* framework.  *See Bekker v.*

*Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000) (citing *McDonnell Douglas*

*Corp. v. Green,* 411 U.S. 792 (1973)).  "In order to prevail in the absence of direct

evidence, a plaintiff must first make out a prima facie case by showing that: (1) [he] is

disabled within the meaning of the ADA; (2) [he] was meeting the legitimate

employment expectations of [his] employer; (3) [he] suffered an adverse employment

action; and (4) similarly situated employees received more favorable treatment."

*Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

We can dispose of Officer Pearman's disparate treatment claim fairly quickly in

this case.  As noted above, in order to prevail on a discrimination claim under the ADA, a

plaintiff must establish that he was discriminated against *because of his disability*.  Here,

Officer Pearman alleged in his complaint and also testified in his deposition that Defendants discriminated against him not because of his disability but because of his relationship with and engagement to fellow officer, Laura Schook, who lodged complaints regarding corruption, favoritism, discrimination, and possible criminal activity against Chief Knight and other members of the NAPD.  Compl. ¶ 49; Pearman Dep. at 106.  Accordingly, his claim of disparate treatment based on his disability never achieves lift off.

Moreover, even assuming that Officer Pearman could establish the other elements of his disparate treatment claim, the only evidence Officer Pearman relies upon in support of this claim is testimony from himself, John Hall, Mark Richards, and Merle Harl that other officers were given light duty assignments during the same time period when Pearman was denied light duty.  However, Officer Pearman has made no effort to show that the other officers so identified were similarly situated to him such that their different treatment could raise an inference of discrimination nor can we simply assume that to be the case.  For these reasons, Defendants are entitled to summary judgment on Plaintiff's disparate treatment claim brought under the ADA.

### B.    Promissory Estoppel

Officer Pearman as an at-will employee asserts a claim against the City for promissory estoppel.  The Indiana Supreme Court has recognized three exceptions to the employment-at-will doctrine, including the doctrine of promissory estoppel.  *Harris v. Brewer*, -- N.E.3d --, 2015 WL 9589791, at *8 (Ind. Dec. 31, 2015).  "[A]n employee

may invoke the doctrine of promissory estoppel by 'pleading the doctrine with

particularity, demonstrating that the employer made a promise to the employee, the

employee relied on the promise to his detriment, and the promise otherwise fits within the

Restatement test for promissory estoppel.'" *Id.* at *10 (quoting *Peru Sch. Corp. v. Grant*,

969 N.E.2d 125, 133-34 (Ind. Ct. App. 2012)).  The Restatement provides:

> A promise which the promisor should reasonably expect to induce action or
> forbearance on the part of the promisee or a third person and which does
> induce such action or forbearance is binding if injustice can be avoided
> only by enforcement. The remedy granted for breach may be limited as
> justice requires.

*Peru Sch. Corp.*, 969 N.E.2d at 133 (citing Restatement (Second) of Contracts § 90(1)

(1981)).

Officer Pearman claims that "through the S.O.P. document issued to [him] in

2004, and again in early 2014, [the City] promised to observe the policies and procedures

contained therein."  Compl. ¶ 76.  Specifically, Officer Pearman alleges that the S.O.P.

provides that "with the approval of a physician and a commanding officer, an officer on

approved sick leave is allowed to perform light duty work at NAPD" and that he received

clearance from his doctors to perform light duty work, but was not allowed to do light

duty work.[6]  *Id.* ¶¶ 77-80.  Contending that the City made "promises contained [in the

---

[6] The Chief of Police offered a longer version of the Limited Duty provision at Plaintiff's
grievance hearing; however, the parties do not contend that this provision was in force at the
time Plaintiff sought limited duties.  Regardless, the long version contains the same discretionary
language that "[a]n officer on authorized sick leave *may* be used for limited duty within the
following guidelines: . . . ."  Defs.' Exh. J.

S.O.P. document] with the expectation that they would be relied upon," Officer Pearman

alleges that he "rel[ied] on these promises when he requested to perform light duty work,

and had a reasonable expectation that the promises contained in the S.O.P. document

would be fulfilled." *Id.* ¶¶ 81-82.

Defendant seeks summary judgment in its favor on Officer Pearman's estoppel

claim for three reasons:  (1) the alleged promise was illusory, (2) Plaintiff did not rely on

the promise to his detriment, and (3) Defendant did not breach that promise.  Dkt. No. 30

at 28.  An illusory promise is defined by Indiana law as "[w]ords of promise which by

their terms make performance entirely optional with the 'promisor' whatever may

happen, or whatever course of conduct in other respects he may pursue, [and] do not

constitute a promise."  Restatement (Second) of Contracts § 2 cmt. e (1981) (cited by

*Pardieck v. Pardieck*, 676 N.E.2d 359, 364 n.3 (Ind. Ct. App. 1997).  Plaintiff agreed in

his deposition that the S.O.P. does not mandate that Plaintiff be allowed to perform light

duty and that working light duty is discretionary.  Although he contends that the exercise

of that discretion should be applied equitably, he does not otherwise address this

argument.

Defendant also contends that Officer Pearman has presented no evidence that he

relied to his detriment on the policy that he "may" be used for limited duty when on

authorized leave.  "The doctrine of promissory estoppel generally provides that a

promisor is estopped from denying the enforceability of a promise when, in reliance on

that promise, the promisee substantially changes his or her position." *Higginbottom ex*

*rel. Davis v. Keithley*, 103 F. Supp. 2d 1075, 1082 (S.D. Ind. 1999) (cited by Plaintiff).

Officer Pearman does not set forth any change in position as a result of the S.O.P.,

Defendant's actions with regard to limited duty, or any other action by Defendant.

Plaintiff, as the party invoking the doctrine of promissory estoppel, has the burden to

establish all facts necessary to support its application. *Id.* at 1082. Even assuming that

Defendant's discretion in the S.O.P. was "destroyed by the common practice of the City

to always grant light duty" [Dkt. No. 36 at 6], Officer Pearman has submitted no evidence

that he relied on the language of the S.O.P. or the application of the S.O.P. to his

detriment. Plaintiff's statement that "the *prima facie* elements of promissory estoppel

have been met as a matter of law & there for [sic] it's for a jury to decide whether

Pearman has sufficiently established he relied on this common practice of always

granting light duty to his detriment" is wholly unsupported by his argument and evidence.

Stating that he has set forth *prima facie* elements of a claim without evidentiary support

simply does not make it so.

In his deposition, Plaintiff redefines his promissory estoppel claim to be based on

a contract between the City and the Fraternal Order of Police Lodge #99 which provides:

"[i]t is agreed by the Employer (NAPD) and the F.O.P. that the City is obligated, legally

and morally, to provide equality of opportunity, consideration, and treatment of all

members of the Police Department as well as to establish policies and regulations that

will insure such equality for all members employed by the Police Department in all

phases of the employment process." Dkt. No. 30 at 29 (citing Plaintiff Dep. at 115-16).

As noted above, under Indiana law promissory estoppel must be pled with specificity.

Plaintiff is not permitted to change the nature of his claim to avoid summary judgment.

*Anderson v. Donahoe,* 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'") (quoted citation omitted).  Accordingly, we need not and do not entertain Plaintiff's newly framed promissory estoppel claim.

## III.   Conclusion

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment.  Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date:   _____4/28/2016_____              _Sarah Evans Barker_____
                                                    SARAH EVANS BARKER, JUDGE
                                                    United States District Court
                                                    Southern District of Indiana

26

Distribution:

Samuel George Hayward
ADAMS HAYWARD & WELSH
chip@samhaywardlaw.com

Brian G. Abell
ADAMS HAYWARD WELSH
brian.abell@samhaywardlaw.com

Laurie Goetz Kemp
KIGHTLINGER & GRAY, LLP-New Albany
lkemp@k-glaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com